**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ROLANDO JIMENEZ**, | |
| Plaintiff, | |
| v. | Case No. 19-cv-2055 (CRC) |
| **CHAD WOLF**, | |
| Defendant. | |

**MEMORANDUM OPINION**

Plaintiff Rolando Jimenez brings a plethora of claims alleging discrimination and retaliation by his employer, U.S. Citizenship and Immigration Services ("USCIS"), a component of the Department of Homeland Security ("DHS"). Jimenez is no stranger to this Court. Previously, he brought employment discrimination claims based on complaints he made to USCIS's Equal Employment Opportunity ("EEO") office in 2012, 2015, and 2017. The Court dismissed some of those claims for failure to exhaust and to state a claim, Jimenez v. McAleenan ("Jimenez I MJP"), 395 F. Supp. 3d 22, 27 (D.D.C. 2019) (resolving the government's motion for judgment on the pleadings), and granted summary judgment to the government on the majority of Jimenez's other claims, Jimenez v. Wolf ("Jimenez I MSJ"), No. 17-cv-2731, Slip Op. at 1 (D.D.C. Sept. 24, 2020). Here, Jimenez brings claims arising out of agency EEO complaints in 2013 and 2014, which are very similar to the claims brought in Jimenez I. Because these claims suffer from many of the same flaws identified in Jimenez I, the Court will grant judgment to the government, as explained further below.

## I.   Background

### A.  Factual Background

Mr. Jimenez, who was born and raised in the Dominican Republic and identifies as Hispanic, has worked for USCIS and its predecessor agency since 1996.  Am. Compl. ¶ 18.  He is currently a GS-14 Immigration Officer with USCIS's Immigrant Investor Program Office in Washington, D.C.  DSOMF ¶ 2 n.1.

Jimenez has lodged numerous complaints with USCIS's EEO office over the years.  As noted above, this Court previously dismissed or granted summary judgment to the government with respect to claims arising out of EEO complaints Jimenez made in 2012, 2015, and 2017. See Jimenez I MJP, 395 F. Supp. 3d at 27; Jimenez I MSJ, Slip Op. at 1.  This case raises similar claims, but arises out of events described in Jimenez's 2013 and 2014 EEO complaints.  For ease of discussion, DHS has helpfully numbered these events one through sixteen and Jimenez has adopted this numbering convention for purposes of his opposition.  The Court will follow suit.

In his 2013 complaint, Jimenez alleged that DHS retaliated against him on the basis of his prior EEO activity and subjected him to a retaliatory hostile work environment.  He alleged that DHS retaliated against him by: adding a memorandum to his personnel file that incorrectly stated that his Performance Plan and Appraisal ("PPA") for Fiscal Year ("FY") 2012 would be delayed (Event 1); denying him a bonus for his performance during the 2012 Fiscal Year (Event 2); failing to select him for seven vacant positions within the agency for which he applied (Events 3-9); retaining one of his colleagues as an acting manager, thereby denying Jimenez the opportunity to serve in a temporary GS-15 level position (Event 11); and giving him a performance appraisal of "Achieved Expectations" (Event 12).  Am. Compl. ¶¶ 23-36, 46-48; see also Def.'s Ex. 2, 2013 Issue Acceptance Letters at 1-2.  He further alleged that he was subjected

to a retaliatory hostile work environment when management: (a) failed to provide him with a mid-cycle review for his FY 2013 PPA; (b) asked him on one occasion to leave his worksite immediately after his shift ended; (c) failed to provide him with an applicable policy supporting that request; and (d) chastised him once for emailing upper management (collectively, Event 10). Am. Compl. ¶¶ 39-45; see also Def.'s Ex. 2, 2013 Issue Acceptance Letters at 2.

In his 2014 EEO complaint, Jimenez brought claims of retaliation and discrimination on the basis of national origin due to DHS's failure to select him for four vacancies (Events 13-16). Am. Compl. ¶¶ 50-63; Def.'s Ex. 7, 2014 Issue Acceptance Letters at 1.  Given the large number of claims, the specific facts relating to each claim will be discussed in context below.

Jimenez's federal complaint advances four counts based on these sixteen events: race discrimination (Count 1); retaliation (Count 2); hostile work environment (Count 3); and national origin discrimination (Count 4).  Because each count asserts that it incorporates all the preceding paragraphs into each claim, the Court construes Jimenez's complaint as alleging that each of the sixteen events were motivated by all four impermissible bases.  Am. Compl. ¶¶ 64, 68, 72, 76.

B.  Procedural Background

Jimenez's 2013 and 2014 EEO complaints followed parallel paths at the agency level. First, DHS conducted full administrative investigations.  Thereafter, Jimenez requested a hearing before Equal Employment Opportunity Commission administrative judges ("AJs"), and the parties engaged in discovery, including multiple depositions and written discovery requests and responses, as part of that litigation.  See Def.'s Ex. 8, EEOC Order on Initial Conf. & Deadlines. After the conclusion of discovery, DHS moved for summary judgment in each case, which was granted by the administrative judges in full.  Def.'s Statement of Material Facts ("SOMF") ¶¶ 6, 12-13.  DHS's Office for Civil Rights and Civil Liberties ("CRCL") then issued final agency

decisions implementing the administrative judges' decisions in their entirety.  Id. ¶¶ 7, 14.
Jimenez appealed both final agency decisions, and the EEOC Office of Federal Operations
affirmed the decisions in full.  Id. ¶¶ 8, 15.

Jimenez then filed suit in this Court and later amended his complaint.  Prior to answering
(and before any discovery had taken place), DHS moved to dismiss the amended complaint
under Federal Rule of Civil Procedure 12(b)(6) or, alternatively, for summary judgment under
Rule 56.  That motion is now ripe.

**II.   Legal Standards**

A.  Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure Rule
12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to
relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A claim
satisfies this standard "when the plaintiff pleads factual content that allows the court to draw the
reasonable inference that the defendant is liable for the misconduct alleged."  Id.  In evaluating a
motion to dismiss, a court must "assume all the allegations in the complaint are true (even if
doubtful in fact)" and "must give the plaintiff the benefit of all reasonable inferences derived
from the facts alleged."  Aktieselskabet AF 21 November 2001 v. Fame Jeans Inc., 525 F.3d 8,
17 (D.C. Cir. 2008) (internal quotation marks and citation omitted).  A court need not, however,
accept a plaintiff's legal conclusion as true, even if "couched as a factual allegation."  Trudeau v.
FTC, 456 F.3d 178, 193 (D.C. Cir. 2006).  Further, a plaintiff cannot defeat a motion to dismiss
by relying on "formulaic recitation[s] of the elements of a cause of action."  Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 555 (2007).

When considering a motion to dismiss a court may consider a document that is central to the plaintiff's claims without converting the motion to one for summary judgment.  See Doe 2 v. Trump, 319 F. Supp.3d 539, 541 (D.D.C. 2018).  A court is similarly permitted to consider documents of which it could take judicial notice.  Therefore, because a "plaintiff's EEOC charge and the agency's determination are both public records," Williams v. Chu, 641 F. Supp. 2d 31, 35 (D.D.C. 2009), a court "may consider a plaintiff's EEOC documents" in evaluating a motion to dismiss, Deppner v. Spectrum Health Care Res., Inc., 325 F. Supp. 3d 176, 184 (D.D.C. 2018).

 B.  Federal Rule of Civil Procedure 56

The Court laid out the relevant summary judgment standards in Jimenez I MSJ, Slip Op. at 5-6.  That discussion follows verbatim:

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment must "show[] that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed R. Civ. P. 56(c).  A fact is material if it "might affect the outcome of the suit under the governing law," and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Additionally, for a factual dispute to count as "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," id. at 252, and cannot rest on "mere allegations" or conclusory statements, see Equal Rights Ctr. v. Post Props., 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011).  The Court is only required to consider the

materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

In deciding a motion for summary judgment, courts must generally "view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." Scott v. Harris, 550 U.S. 372, 378 (2007) (internal citations and quotation marks omitted). In making this determination, the court "may not make credibility determinations or otherwise weigh the evidence." Johnson v. Perez , 823 F.3d 701, 705 (D.C. Cir. 2016). Thus, "a party may oppose summary judgment with sworn testimony, and . . . that party's own sworn testimony can alone defeat summary judgment." United States v. Seventeen Thousand Nine Hundred Dollars ($17,900.00) in U.S. Currency, 859 F.3d 1085, 1092 (D.C. Cir. 2017). Nevertheless, there exist "narrow circumstances under which courts may 'lawfully put aside testimony [because it] is so undermined as to be incredible.'" Id. (quoting Robinson v. Pezzat, 818 F.3d 1, 10 (D.C. Cir. 2016)). Specifically, courts may set aside self-serving and uncorroborated testimony "when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, *and* undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury." Chenari v. George Washington University, 847 F.3d 740, 747 (D.C. Cir. 2017) (emphasis added) (internal citation and quotation marks omitted). In other words, if "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Lash v. Lemke, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting Scott, 550 U.S. at 380).

## III.  Analysis

DHS first contends that many of Jimenez's claims should be dismissed because he failed to administratively exhaust his claims before the agency.  For the claims that were exhausted, the government seeks summary judgment on the grounds that Jimenez has either not identified an adverse employment action as required to establish a prima facie case or has failed to establish pretext.  Lastly, the government contends that Jimenez's hostile work environment claim should be dismissed for failure to state a claim.  The Court begins with the government's exhaustion arguments.

### A.  Exhaustion

#### 1.  Discrete Acts

It is well established that "[a]n employee must timely file an administrative claim with his employing agency (here, DHS) and exhaust all internal remedies before bringing a civil action under Title VII[.]"  Jimenez I MJP, 395 F. Supp. 3d at 31 (citing Coleman v. Duke, 867 F.3d 204, 206 (D.C. Cir. 2017)).  Title VII further requires an employee to exhaust each unlawful basis for the adverse employment action.  For example, a plaintiff who brings race and national origin discrimination claims is required to exhaust both claims even if the charges are based on the same alleged acts.  See, e.g., Hernandez v. Mao, 235 F. Supp. 3d 172, 177 (D.D.C. 2017) (dismissing claims of race and national origin discrimination where plaintiff only exhausted claims of hostile work environment); Demissie v. Starbucks Corp. Office & Headquarters, 19 F. Supp. 3d 321, 324 (D.D.C. 2014) ("[B]ecause plaintiff only alleged discrimination on the basis of national origin in her EEOC charge, she has failed to exhaust her current claims of discrimination on the basis of race and gender.").  A plaintiff's alleged failure to exhaust

administrative remedies is an affirmative defense analyzed under Rule 12(b)(6) for failure to state a claim.  See Scott v. Dist. Hosp. Partners, L.P., 60 F. Supp. 3d 156, 161 (D.D.C. 2014).

        a.   Events 1-12 with Respect to Race (Count I) and National Origin (Count IV)

DHS contends that Jimenez failed to exhaust his claims of race and national origin discrimination that are based on Events 1-12.  Although Jimenez does not respond to this argument, Opp. 28-38, the Court's review of the 2013 EEO administrative record confirms the government's contention.  The 2013 EEO complaint, which covered Events 1-12, alleged that the agency retaliated against Jimenez based on prior EEO activity and subjected him to a retaliatory hostile work environment.  Def.'s Ex. 1, 2013 EEO Complaint.  Jimenez did not assert race or national origin as the basis for those claims at any point during the EEO process.  Id.; Def.'s Ex. 2, 2013 Issue Acceptance Letters at 1-2; Def.'s Ex. 3, AJ Decision and Order at 4-5.  The Court therefore dismisses Jimenez's race and national origin discrimination claims with respect to Events 1-12.

        b.   Events 13-16 with Respect to Race (Count I) and National Origin (Count IV)

Although the government concedes that Jimenez has properly exhausted his national origin claim with respect to Events 13-16, it maintains that he has he failed to exhaust his race discrimination claim as to those events.  See Mot. to Dismiss or, Alternatively, for Summ. J. ("Mot.") at 13.  Though Jimenez's 2014 complaint at first identified "race" as the basis for the alleged discriminatory conduct, Def.'s Ex. 6, 2014 EEO Complaint, he claimed that he was discriminated against because he is Hispanic, which the EEOC considers under its Title VII jurisprudence to be national origin discrimination, not race discrimination.  At the direction of the AJ, Jimenez agreed to substitute his race discrimination claim for a national origin claim

before the EEOC.  Def.'s Ex. 8, 2014 AJ Order on Initial Conf. & Deadlines at 1 ("During the

Initial Conference, [the administrative judge] explained to Counsel for the Complainant that the

Commission views Hispanic as national origin not as race.  Counsel for Complainant withdrew

the basis of race and added the basis of national origin.").  Given that Jimenez attempted to bring

a race discrimination claim, and that claim overlaps entirely with his national origin

discrimination claim, the Court will consider his race discrimination claim to have been properly

exhausted.

### 2. *Hostile Work Environment (Count III)*

As the government notes, it is unclear whether Jimenez has alleged a standard

discriminatory hostile work environment claim or a retaliatory hostile work environment claim.

In an abundance of caution, the Court will consider both.

First, DHS contends that Jimenez entirely failed to exhaust any standard hostile work

environment claim.  "[C]ourts do not require a plaintiff to have invoked a hostile work

environment claim by name or to use specific 'magic words' in order to exhaust it.  But typically

the plaintiff must offer at least some suggestion of a hostile work environment . . . such as by

referring to an ongoing pattern of conduct or describing a workplace pervaded by abuse."

Congress v. District of Columbia, 324 F. Supp. 3d 164, 171 (D.D.C. 2017) (Cooper, J.) (citation

omitted).  "Courts therefore look to whether a plaintiff described only discrete events in his

administrative charge or also patterns of conduct or other characteristics typical of a hostile work

environment claim."  Jimenez I MJP, 395 F. Supp. 3d at 33.

Here, neither Jimenez's 2013 EEO complaint nor his 2014 complaint alleges a pattern of

ongoing abuse typical of a hostile work environment claim.  Def.'s Ex. 1, 2013 EEO Complaint;

Def.'s Ex. 6, 2014 EEO Complaint.  Additionally, the agency's letters accepting Jimenez's

allegations for investigation make no mention of a hostile work environment claim.  Def.'s Ex. 2, 2013 Issue Acceptance Letters at 1-2; Def.'s Ex. 7, 2014 Issue Acceptance Letters.  Jimenez's allegations "could not, therefore, be 'reasonably expected upon investigation to lead to a hostile work environment.'"  Jimenez I MJP, 395 F. Supp. 3d at 33 (quoting Park v. Howard Univ., 71 F.3d 904, 908 (D.C. Cir. 1995)).  Consequently, the Court finds that Jimenez failed to exhaust his standard hostile work environment claims and will dismiss Count III with regard to such a claim.[1]

Moving to Jimenez's potential retaliatory hostile work environment claim, DHS does not dispute that Jimenez exhausted such a claim as it pertains to the four workplace incidents that comprise Event 10.  As was the case in Jimenez I MJP, the issue is whether "Jimenez can also rely on the *other* allegations advanced in [his] complaints to support his overall retaliatory hostile environment claim."  395 F. Supp. 3d at 34 (emphasis added).

As the Court previously explained, a plaintiff "may incorporate non-exhausted allegations into a hostile work environment claim so long as some allegations were exhausted and all of the allegations together form one hostile environment claim."  Jimenez I MJP,  395 F. Supp. 3d at 34 (quoting Hyson v. Architect of Capitol, 802 F. Supp. 2d 84, 96 (D.D.C. 2011)).  "To form one claim, the unexhausted allegations must be 'adequately linked" to the exhausted ones," meaning that the unexhausted claims "involve the same type of employment actions, occur[ ] relatively frequently, and [are] perpetuated by the same managers."  Id. at 34–35 (quoting Baird v. Gotbaum, 662 F.3d 1246, 1251 (D.C. Cir. 2011).

---

[1] Jimenez again did not respond to the government's argument that he failed to exhaust his hostile work environment claim.  Nor did he clarify whether he was bringing both a standard and a retaliatory hostile work environment claim or whether he was bringing retaliatory hostile work environment claim only.  See Opp. 28-38.

Here, the question is whether Event 10—the four-part allegation that DHS (a) failed to provide Jimenez with a mid-cycle review for his FY 2013 PPA; (b) once asked him to leave his worksite immediately after his shift ended; (c) refused to provide him with an applicable policy supporting that request; and (d) chastised him on a single occasion for emailing upper management, Am. Compl. ¶¶ 39-45—is adequately linked to the other events.[2]  First, with regard to the eleven non-selection events (Events 3-9, 13-16), the Court concludes that these events are not adequately linked to Event 10 because, as will be described in further detail below, each non-selection involved various selecting officials, who were entirely different from the officials in Jimenez's direct line of supervision who allegedly took the actions at issue in Event 10. Moreover, the eleven non-selections are not the same type of employment actions involved in Event 10.  The Court therefore concludes that Jimenez failed to exhaust his retaliatory hostile work environment claim with regard to Events 3-9 and 13-16.

The remaining events, Events 1, 2, 11, and 12, are arguably adequately linked to the claims exhausted in Event 10.  To recap, Jimenez alleges that DHS:  delayed Jimenez's PPA for FY 2012 (Event 1); denied Jimenez a bonus for his performance during the 2012 Fiscal Year (Event 2); kept one of his colleagues as an acting manager, thereby denying Jimenez the opportunity to serve in a temporary GS-15 level position (Event 11); and gave Jimenez a performance appraisal of "Achieved Expectations" (Event 12). Am. Compl. ¶¶ 23-36, 46-48; see also Mot. Ex. 2 at 1-2 (2013 Issue Acceptance Letters).  Because these events appear to have involved the same managers implicated in Event 10—David Fagan, Kevin Quinn, and Toni

_____

[2] Jimenez, again, does not respond to the government's contention that his hostile work environment claim was not exhausted.  The Court could, therefore, treat the government's argument as conceded, but has instead examined the merits of the government's argument.

Swanson—and are similar in kind to the actions alleged in Event 10, the Court will deem Events 1, 2, 11, and 12 to be exhausted for purposes of Jimenez's retaliatory hostile work claim.

In sum, Jimenez may not proceed with his standard discriminatory hostile work environment claim due to failure to exhaust. He may, however, rely on Events 1, 2, 10, 11, and 12 in pressing his retaliatory hostile work environment claim but may not rely on Events 3-9 or 13-17. Although Jimenez may rely on these allegations because they were properly exhausted, it does not necessarily follow that he has plausibly pleaded discrete claims of retaliation or a claim or retaliatory work environment claim with regard to these events. The Court will assess those questions below.

B. <u>Pre-Discovery Summary Judgment</u>

The Court next considers whether the government is entitled to summary judgment because Jimenez has either not identified an adverse action or failed to establish pretext. Before doing so, however, the Court will first address two procedural issues: pre-discovery summary judgment and compliance with the summary judgment briefing procedures in Local Civil Rule 7(h).

1. *Pre-Discovery Summary Judgment*

Courts rarely consider a summary judgment motion prior to discovery. As this Court explained in <u>Jimenez I MSJ</u>:

> [S]ummary judgment is ordinarily appropriate only after the plaintiff has been given an adequate opportunity to conduct discovery. <u>See, e.g.</u>, <u>Curtis v. Dep't of Vet. Affairs</u>, 19-cv-3271 (CRC), ECF 39 (D.D.C. June 30, 2020) (Cooper, J.); <u>Glasgow v. United States Dep't of Def.'s</u>, No. 18-CV-136, 2018 WL 5886654, at *3 (D.D.C. Nov. 9, 2018) (Cooper, J.). Nevertheless, "even at [an] early stage, a district court may deny a request for discovery and grant a motion for summary judgment when the non-moving party 'offer[s] no reasonable basis to suggest that discovery' will bear out its claims.'" <u>Turner v. U.S. Capitol Police</u>, 34 F. Supp. 3d 124, 134-35 (D.D.C. 2014) (quoting <u>Carpenter v. Fed. Nat'l Mortg. Ass'n</u>, 174 F.3d 231, 237-38 (D.C. Cir. 1999)). Indeed, Federal Rule of Civil Procedure

56(b) specifically allows that "a party may file a motion for summary judgment at any time until 30 days after the close of all discovery."

When confronted with a pre-discovery summary judgment motion, it is incumbent upon the opposing party to request discovery under Rule 56(d), which requires the nonmovant to submit an affidavit which "state[s] with sufficient particularity . . . why [additional] discovery [is] necessary." Ikossi v. Dep't. of Navy, 516 F.3d 1037, 1045 (D.C. Cir. 2008) (internal citation and quotation marks omitted). The affidavit must: (1) "outline the particular facts he intends to discover and describe why those facts are necessary to the litigation"; (2) "explain why [he] could not produce [the facts] in opposition to the motion for summary judgment"; and (3) "show the information is in fact discoverable." Convertino v. U.S. Dep't of Justice, 684 F.3d 93, 100 (D.C. Cir. 2012) (internal citation and quotation marks omitted).

Slip Op. at 6-7.

Here, unlike in Jimenez I, Jimenez does *not* make any argument that summary judgment is premature. Rather, he implies the opposite: "Plaintiff has sufficient evidence to establish that Defendant's stated reasons are not credible." Opp. 35. Nor has Jimenez filed a Rule 56(d) motion or supporting affidavit. The Court thus concludes that Jimenez has waived any argument that further discovery is necessary to support his claims.

### 2. *Local Rule 7(h)*

The Court next turns to Jimenez's compliance with the local rules, which the Court also addressed in Jimenez I MSJ:

"Litigants before this Court are not only expected to follow its Local Rules, they are 'duty bound' to do so." Robinson v. D.C., 130 F. Supp. 3d 180, 186–87 (D.D.C. 2015) (quoting Texas v. United States, 798 F.3d 1108, 1114 (D.C. Cir. 2015)). Here, the government contends that Jimenez has failed to abide by Local Civil Rule 7(h), which governs summary-judgment practice. It provides:

Each motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement. An opposition to such a motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement. Each such motion and opposition must also

contain or be accompanied by a memorandum of points and authorities and proposed order as required by LCvR 7(a), (b) and (c).  In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

LCvR 7(h)(1) (emphasis added).

Experienced litigants should know that the "generally observed practice is for the moving party to file its statement of facts, and the opposing party to respond to that statement by indicating whether it 'admits' or 'denies' each fact presented." Murray v. Amalgamated Transit Union, 183 F. Supp. 3d 6, 16 (D.D.C. 2016).  If the opposing party denies a fact, it must include an explanation with citations to competent evidence in the record.  After specifically responding to the moving party's statement of undisputed facts, "the opposing party may then provide its own statement of facts, again with record citations, to the extent it believes such facts are necessary to its argument."  Id.  Lest there be any confusion, although it is best practice to follow this generally observed approach, failure to do so does not necessarily violate Local Rule 7(h).  Rather, a party may satisfy Rule 7(h) by providing "a separate concise statement of genuine issues," prepared according to any number of methods, so long as the statement "set[s] forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated" and "include[s] references to the parts of the record relied on to support the statement."  LCvR 7(h)(1).

Slip Op. at 8-9.

Here, as in Jimenez I, the government argues that Jimenez has ignored the requirements of Rule 7(h) by filing a statement of facts that: (1) fails to reference the government's statement of material facts in a manner that identifies which facts he believes are disputed and which are not (indeed, his statement of facts makes no reference to the government's statement at all); (2) includes few citations to the record; and (3) where it does provide citations to the record, frequently either miscites the record or fails to cite competent evidence.  Pl.'s Statement of Material Facts in Dispute ("PSOMF").[3]  Due to these purported failures, the government once

---

[3]  The record includes a "Statement of Facts" contained in Jimenez's opposition, along with a "Statement of Material Facts in Dispute."  Both statements appear to be extremely similar and neither satisfies the requirements of Rule 7(h).  To avoid confusion, the Court will cite to Jimenez's Statement of Material Facts in Dispute ("PSOMF").

again urges the Court to deem Jimenez to have admitted the version of events laid out in its

statement of undisputed facts.

As the Court previously explained:

The sanction sought by the government is expressly contemplated by Local Rule 7(h), which warns that "the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1). Similarly, Federal Rule of Civil Procedure 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . , the court may . . . consider the fact undisputed for purposes of the motion." And the D.C. Circuit has counseled that "[i]f the party opposing the motion fails to comply with this local rule, then 'the district court is under no obligation to sift through the record' and should '[i]nstead . . . deem as admitted the moving party's facts that are uncontroverted by the nonmoving party's Rule [LCvR 7(h)] statement.'" SEC v. Banner Fund Int'l, 211 F. 3d 602, 616 (D.C. Cir. 2000) (citation omitted); see also Oviedo v. Washington Metro. Area Transit Auth., 948 F.3d 386, 398 (D.C. Cir. 2020) (affirming grant of summary judgment against a *pro se* plaintiff who failed to dispute the defendant's statement of facts).

Although "penalizing litigants for violating local rules may seem unduly formalistic, the purposes here are sound and sensible." Robinson, 130 F. Supp. 3d at 186–87. As the D.C. Circuit has explained, "'the procedure contemplated by [Local Rule 7(h)] . . . isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record.'" Burke v. Gould, 286 F. 3d 513, 517 (D.C. Cir. 2002) (quoting Gardels v. CIA, 637 F. 2d 770, 773 (D.C. Cir. 1980) and discussing Rule 7(h)'s predecessor, Rule 108(h)).

Jimenez I MSJ, Slip Op. at 10-11.

The Court again concludes that it is appropriate to hold Jimenez to Rule 7(h)'s

requirements. Jimenez's complaint brings claims of race discrimination, national origin

discrimination, retaliation, and hostile work environment based on sixteen distinct events. That

amounts to 64 separate claims.[4] Once again, Jimenez has failed completely to "isolate[] the facts

that [he] assert[s] are material, distinguish[] disputed from undisputed facts, and identif[y] the

---

[4] As previously noted, these claims are in addition to the seventeen separate claims, based on three different classes as well as retaliation for prior protected activity, raised in Jimenez I MSJ, Slip Op. at 11.

pertinent parts of the record." <u>Burke</u>, 286 F.3d at 517 (internal quotation marks and citations omitted).  Consequently, the Court will again treat the entirety of the government's statement of undisputed facts as conceded.  Those facts establish that USCIS either did not subject Jimenez to an adverse employment action or based his non-selection for various vacancies on legitimate, non-discriminatory reasons.  Because these facts do not suggest any pretext for the agency's explanations of those reasons, it is entitled to summary judgment.

Nevertheless, while the Court will grant summary judgment to USCIS due to Jimenez's failure to comply with Local Rule 7(h), in the interest of efficiency in the event of a successful appeal of the Court's ruling, the Court will proceed to analyze the merits of Jimenez's non-selection claims, as it did it Jimenez I.  As much as possible, the Court has endeavored to discern which facts might be in dispute and on what basis.  While Jimenez's briefing makes this work difficult, the Court has determined that most of the facts proffered by Jimenez in his purported statement of facts simply reiterate those in the government's statement.  While Jimenez appears to attempt to dispute some facts, many of those disputes are either not material to the legal analysis or are not supported with competent evidence.  The Court will therefore base its analysis of Jimenez's claims primarily upon the government's statement of facts.  Where relevant, however, it will discuss what it discerns to be Jimenez's objections to particular facts proffered by the government.

### 3.  Retaliatory Adverse Employment Actions under Title VII

The government contends that it is entitled to summary judgment with respect to Events 1, 2, 11, and 12 because these events, even if they occurred as Jimenez alleges, are not materially adverse actions under Title VII.  Because the Court has found that Jimenez failed to exhaust his race discrimination and national origin claims with regard to these events, the Court need only

assess whether these events qualify as adverse employment actions with regard to Jimenez's claims of retaliation and retaliatory hostile work environment.

Title VII forbids an employer from retaliating against an employee for engaging in protected EEO activity.  To make out a *prima facie* claim of retaliation under Title VII, a plaintiff must establish that he suffered "(i) a materially adverse action (ii) because [he] had brought or threatened to bring a discrimination claim." Baloch v. Kempthorne, 550 F.3d 1191, 1198 (D.C. Cir. 2008).  "In most cases in federal court, adverse action is not in dispute and the court may turn to the familiar McDonnell Douglas burden-shifting framework to review the second element of a plaintiff's discrimination claim." Weng v. Solis, 960 F. Supp. 2d 239, 246 (D.D.C. 2013).  But where the government challenges an action as not materially adverse, the analysis must begin there. See Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008); Bruder v. Chu, 953 F. Supp. 2d 234, 240 (D.D.C. 2013).

The Court previously explained the different standards for an adverse action in the discrimination and retaliation contexts:

> What constitutes an adverse action in the discrimination context is different than what constitutes an adverse action in the retaliation context.  A discriminatory adverse action is one that affects the terms, conditions, or privileges of employment or future employment such that a reasonable trier of fact could find objectively tangible harm.  A retaliatory adverse action, meanwhile, encompasses a broader sweep of actions than those in a pure discrimination claim and may extend to harms that are not workplace-related or employment-related so long as a reasonable employee would have found the challenged action materially adverse.  The test, in this context, is whether the action might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  But even with its broader reach, a retaliatory adverse action is still limited to cases in which an employer causes material adversity, not trivial harms.

Jimenez I MJP, 395 F. Supp. 3d at 38 (emphasis in original) (internal citations and quotations omitted).  The Court thus turns to whether Jimenez has adequately alleged adverse actions for his retaliation claim insofar as it is based on Events 1, 2, 11, and 12.

a. Underline Event 1 – Plaintiff's Fiscal Year 2012 Performance Standards and Appraisal Rating

Jimenez alleges that he suffered an adverse action when a memorandum was erroneously uploaded to his personnel file, causing his performance plan and annual rating to be delayed. A bit of background is in order. Originally, Jimenez's Fiscal Year 2012 ("FY12") rating period for his position as a GS-14 FDNS Immigration Officer was scheduled to run from January 31, 2012 through September 30, 2012. SOMF ¶ 19. But because Jimenez was detailed to another USCIS office from March to September 2012 and DHS required employees to serve a minimum of 90 days under a performance plan before they could be rated under that plan, his rating was delayed until December 11, 2012. SOMF ¶¶ 16, 19, 20. At that point, he received his FY12 performance plan with a rating of "Exceeds Expectations." SOMF ¶ 20. At some point prior to that December 2012 rating, Lisa Pidgeon, an employee in the USCIS Human Resources office in Vermont (who was not in Jimenez's supervisory chain of command), uploaded a memo ("FY12 Memorandum") to Jimenez's electronic employee file. The FY12 Memorandum stated that Jimenez's performance rating could not be issued on time in September 2012 and therefore would be deferred until Jimenez had served a minimum of 90 days under the performance plan. SOMF ¶ 17. Jimenez appears to allege that this memorandum was uploaded erroneously because, according to him, his annual rating could have and should have been completed on September 30, 2012, as was originally scheduled. Am. Compl. ¶ 23; PSOMF ¶¶ 3-27. When Jimenez learned of this memo in February 2013, months after he received his performance rating in December 2012, he maintained that it adversely affected him because "[t]he lack of a performance plan impaired [his] ability to work toward his goals and receive a favorable performance rating during the performance period" and "[he] was in great distress when he was required to work without a performance plan." Am. Compl. ¶¶ 24, 26.

18

The FY12 Memorandum and the associated delay with Jimenez's performance rating and plan cannot constitute adverse employment actions because no reasonable trier of fact could conclude that Jimenez suffered a material harm on account of these minor inconveniences, even assuming that his performance rating and plan could have been issued in September 2012. Though Jimenez correctly notes that delays in personnel actions may qualify as adverse actions where the delay causes a materially adverse effect, Opp. 31, he has not identified any such effect arising from the FY12 memorandum.  Indeed, though Jimenez contends that "[t]he lack of a performance plan impaired [his] ability to work toward his goals" and caused him "great distress," Am. Compl. ¶¶ 24, 26, it is undisputed that Jimenez only learned of the memorandum in February 2013—months *after* he had received his performance rating in December 2012, id.; Def.'s Ex. 17, FY 12 PPA.  At no point does he explain how the allegedly erroneous memorandum or the delay in receiving his performance rating adversely affected him.  Even under the lower standard for retaliatory adverse actions, the issuance of the memorandum and the associated delay in receiving his performance rating are a "trivial harm[s]" that do not qualify as materially adverse actions.  See Wiley v. Glassman, 511 F.3d 151, 161 (D.C. Cir. 2007).

### b.  Event 2 – Plaintiff's Fiscal Year 2012 Performance Award

Jimenez next complains that he suffered an adverse employment action when he was denied a cash bonus to which he was entitled.  When Jimenez received an FY12 rating of "Exceeds Expectation" in December 2012, he became entitled to receive a cash award of approximately $900 from USCIS.  SOMF ¶¶ 23-23; Def.'s Ex. 19, SF-50 Reflecting Cash Award.  However, although his and a fellow employee's performance ratings were promptly sent by Jimenez's supervisor to USCIS's human resources department in December 2012, their ratings were inexplicably overlooked by the human resources specialist responsible for

processing the cash awards.  SOMF ¶ 24-26; Def.'s Ex. 21, Email from McEvoy regarding

delayed cash awards.  By the time the mistake was brought to the attention of the USCIS human

resources department, in June 2013, USCIS was unable to process the awards due to

government-wide sequestration, which caused all bonuses to USCIS employees to be frozen.

SOMF ¶ 23; Def.'s Ex. 14, Coffren Aff. at 240-41; Def.'s Ex. 20, Fagan Aff. at 222-23; Def.'s

Ex. 21, Email from McEvoy regarding delayed cash awards.  Ultimately, for reasons which are

not clear from the record, Jimenez's bonus was not paid out until February 2016.  SOMF ¶ 24;

Def.'s Ex. 19, SF-50 Reflecting Cash Award.

Although Jimenez cannot maintain the claim stated in his complaint—based on the *denial*

of a cash bonus—because the bonus was eventually paid out, the Court will generously construe

Jimenez's claim to be that he was adversely harmed by the three-year *delay* in receiving the

bonus.  Framed as such, the Court concludes that Jimenez has identified a materially adverse

action because a three-year delay in receiving $900 is an objectively tangible harm, especially

under the more deferential standards for adverse actions in retaliation claims.  See Russell v.

Principi, 257 F.3d 815, 819 (D.C. Cir. 2001) ("[A] bonus is a tangible, quantifiable award . . .

[with a] direct, measurable, and immediate effect.  Furthermore, the loss of a bonus that is worth

hundreds of dollars is not a petty detriment.").  However, although the delay in receiving his cash

bonus qualifies as an adverse employment action, the agency has supplied a legitimate, non-

discriminatory reason for the delay: the government-wide sequestration, which prevented USCIS

from paying out any bonuses to its employees.  Because Jimenez fails to respond to that

explanation or otherwise present evidence showing that this explanation is pretextual, the

government is entitled to summary judgment with regard to this event.

c.   Event 11– Denial of Temporary Detail to a Supervisory Position

Next, Jimenez alleges that he was retaliated against when he was passed over to serve as the Acting Chief of the Screen Coordination Office.  Am. Compl. ¶ 46.  Instead of selecting a new person to fill the position, USCIS opted to extend the detail of one of Jimenez's then-coworkers, Kevin Quinn.  SOMF ¶ 34.

Although there is no *per se* rule that denying an employee the opportunity to serve as a temporary supervisor could never be a materially adverse action, "courts have consistently held that such claims do not rise to the level of an adverse action unless accompanied by a tangible change in employment."  Moore v. Ashcroft, 401 F. Supp. 2d 1, 42 (D.D.C. 2005); see also Stewart v. Evans, 275 F.3d 1126, 1135 (D.C. Cir. 2002) ("Because denial of . . . temporary designation is not an adverse employment action, mere interference with or delay of such a designation cannot be a cognizable harm under Title VII."); Taylor v. Federal Deposit Insurance, 132 F.3d 753, 764 (D.C. Cir. 1997) (same).  Here, Jimenez has failed to show that he suffered any objectively tangible harm from not being chosen to serve as acting director.  Indeed, he does not even allege, much less offer evidence showing, that he requested to serve in the role, was qualified to serve in the role, or that management denied any request to serve in the role.  Though Jimenez argues in conclusory fashion that "the record establishes that temporary placements in roles serve as career changing opportunities and Plaintiff was treated differently than any of his colleagues," Opp. 32, he fails to identify any record evidence to support that bald allegation.  Event 11 therefore does not qualify as an adverse employment action.

d.   Event 12– A performance rating of "Achieved Expectations"

For fiscal year 2013, Jimenez was given a performance rating of "Achieved Expectations."  He maintains that this rating was a materially adverse action because his performance during this period was in fact "exceptional."  Am. Compl. ¶ 47.

"[I]n most circumstances performance evaluations alone at the satisfactory level or above should not be considered adverse employment actions."  Russell, 257 F.3d at 819; see also Bruder v. Chu, 953 F. Supp. 2d 234, 241 (D.D.C. 2013) (collecting cases).  "However, when a performance rating is directly tied to monetary gain, the D.C. Circuit has held that a lower performance rating can constitute an adverse employment action."  Bruder, 953 F. Supp. 2d at 241.

Here, although Jimenez's rating of "Exceeds Expectations" in FY12 entitled him to a monetary gain, he does not allege or present any evidence showing that his FY13 rating of "Achieved Expectations" resulted in the loss of a monetary bonus.  Am. Compl. ¶ 47; PSOMF ¶¶ 75-84.  Absent any indication that this performance rating resulted in an objectively tangible harm, Event 12 fails to qualify as an adverse action.

4.   Retaliatory Non-selection Claims

The Court repeats the standards for both discriminatory and retaliatory non-selection claims that it laid out in Jimenez I MSJ:

To establish a *prima facie* case of discrimination for non-selection, a plaintiff must show that: (1) he is a member of a protected class (or, under the ADEA, that he is at least forty years of age); (2) he applied for a vacant position; (3) he was qualified for the position; and (4) the person selected was outside of the protected class (or, under the ADEA, was substantially younger than the plaintiff).  See Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1155 (D.C. Cir. 2004);

Cones v. Shalala, 199 F.3d 512, 516 (D.C. Cir. 2000).  Similarly, to establish a *prima facie* case

of retaliation in the form of a non-selection, [a plaintiff] must present sufficient evidence to

"'show: (1) that [he] engaged in a statutorily protected activity; (2) that the employer took an

adverse personnel action; (3) that a causal connection existed between the two[]; (4) that he

applied for an available job; and (5) that he was qualified for that position.'"  Mount v. Johnson,

174 F. Supp. 3d 553, 560 (D.D.C.), aff'd, 664 F. App'x 11 (D.C. Cir. 2016) (quoting Morgan v.

Fed. Home Loan Mortgage Corp., 328 F.3d 647, 651 (D.C. Cir. 2003)).

      For both discrimination and retaliation claims, where the plaintiff can adduce no direct

evidence of discrimination or retaliation, as is true here, the Court applies the familiar burden-

shifting framework set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973).

See Glasgow, 2018 WL 5886654, at *3.  Under that framework, a plaintiff must establish "a

*prima facie* case of discrimination by showing that [he]: (1) is a member of a protected class; (2)

suffered an adverse employment action; and that (3) the unfavorable action gives rise to an

inference of discrimination."  Nurriddin v. Bolden, 818 F.3d 751, 758 n.6 (D.C. Cir. 2016).  If

the plaintiff succeeds in establishing his *prima facie* case, the burden then shifts to the employer

"to articulate some legitimate, nondiscriminatory reason" for its actions.  McDonnell Douglas,

411 U.S. at 802.  However, the D.C. Circuit has clarified that courts "need not—*and should

not*—decide whether the plaintiff actually made out a *prima facie* case under McDonnell

Douglas," where "an employee has suffered an adverse employment action" and "an employer

has asserted a legitimate, non-discriminatory reason for the decision."  Brady v. Office of

Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original).  "Rather, in

considering an employer's motion for summary judgment . . . in those circumstances," the

district court need resolve only whether the employee has "produced sufficient evidence for a

reasonable jury to find that the employer's asserted non-discriminatory [or non-retaliatory] reason was not the actual reason and that the employer intentionally discriminated [or retaliated] against the employee."  Id.  The operative question here, then, is whether Jimenez has produced sufficient evidence such that a reasonable jury could find that the actual reason he was not selected for the eleven challenged vacancies is because of his race, national origin, age, or prior EEO activity.

In evaluating a plaintiff's evidence of pretext, "[c]ourts weigh relative qualifications differently in the discriminatory versus the retaliatory non-selection contexts."  Savage v. Burwell, No. 15-CV-00791 (CRC), 2016 WL 4132196, at *6 (D.D.C. Aug. 3, 2016) (Cooper, J.). In *discriminatory* non-selection cases, no inference of discrimination arises unless the plaintiff proves that he was "'substantially more qualified' to perform the duties listed in the vacancy announcement than the successful candidate."  Porter v. Shah, 606 F.3d 809, 815-16 (D.C. Cir. 2010) (quoting Lathram v. Snow, 336 F.3d 1085, 1092 (D.C. Cir. 2003)).  Said otherwise, a plaintiff must demonstrate a "stark superiority of credentials" over the selectee in order to establish an inference of pretext.  Stewart v. Ashcroft, 352 F.3d 422, 429 (D.C. Cir. 2003).  By contrast, the standard in *retaliatory* non-selection cases is more favorable to the plaintiff.  A plaintiff "need not demonstrate that [he] was 'significantly more qualified' than the selectee." Savage, 2016 WL 4132196, at *6 (quoting Román v. Castro, No. 12-cv-01321, 2016 WL 829874, at *12 (D.D.C. 2016)).  Rather, he need only show that the "'relative difference' between [his] qualifications" and those of the selectee "does not so greatly favor" the selectee "that no reasonable jury could conclude [that he] would have been promoted but for the alleged retaliatory animus" of the deciding officials.  Id. (quoting Kilby-Robb v. Duncan, 77 F. Supp. 3d 164, 176 (D.D.C. 2015)) (internal quotation marks omitted).

Under both standards, the D.C. Circuit has cautioned that neither the ADEA nor Title VII empowers a federal court to become "'a super-personnel department that reexamines an entity's business decisions.'"  Barbour v. Browner, 181 F.3d 1342,1346 (D.C. Cir. 1999) (quoting Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986).  Thus, courts must "defer to the [employer's] decision of what nondiscriminatory qualities it will seek" in filling a position, Stewart, 352 F.3d at 429, including "the employer's decision as to which qualities required by the job . . . it weighs more heavily," Jackson v. Gonzales, 496 F.3d 703, 709 (D.C. Cir. 2007).  In short, unless the employer's reasons for selecting another candidate are "indeed a pretext, . . . the court must respect the employer's unfettered discretion to choose among qualified candidates." Fischbach, 86 F.3d 1180.

The Court will apply this framework to Jimenez's ten claims for retaliatory and discriminatory non-selection.  Because the government has asserted a legitimate, non-discriminatory reason for each of the non-selections (as will be discussed below), the Court will assume that Jimenez has established a *prima facie* case for each claim and will focus its analysis on whether he has demonstrated that the government's proffered reasons for his non-selections are pretexts for unlawful retaliation or discrimination.  To recap, non-selection Events 3-9 will be assessed to determine whether the non-selections were retaliatory only, while Events 13-16 will be assessed to determine whether the non-selections were also discriminatory due to Jimenez's national origin.

a.   Jimenez's Blanket Arguments for All Non-Selections

Before analyzing each specific non-selection claim, the Court will begin by addressing several broad arguments that Jimenez indiscriminately advances with respect to all ten of the non-selections:

(1) In all of Plaintiff's non-selection claims, he has made the best qualified list, he possesses the equivalent experience, but he is either interviewed and the information provided is subject[ive] and inconsistent for his non-selection, or he is not selected for an interview and the selectees for the position have not engaged in any protected activity.

(2) The selecting officials, panelists, recommending officials, all demonstrated a subjective, often irrelevant, and unsupported basis for the decision to either not interview Plaintiff or why his interview/resume was not selected.

(3) [T]he individuals involved in selecting the resumes, interviewees are all aware of Plaintiff's claims and several of the individuals' retaliatory animus is included in their own sworn statements with emails and documents referencing Plaintiff's EEO case.

(4) In this case, the non-selections are often based on lack of supervisory (acting or otherwise) experience when the selectees have only 3-months and Plaintiff has had supervisory experience, allegations that Plaintiff never answered certain questions which he disputes, or that the information is no longer available.

(5) Plaintiff is the highest graded applicant with the most experience and has always made the best qualified list; however, he is never selected because the same interview panel are tasked with the selection and he is unable to grow his professional opportunities because of those reasons which is purported in the agency's own testimony.[5]

(6) The selecting officials in this case are often vague, inconsistent, or intentionally dishonest about their considerations and evaluations of Plaintiff's employment.

Opp. 32-37.  For each of these arguments, Jimenez makes no attempt cite to competent evidence in the record or in any way connect his broad assertions to the specific non-selection claims.  In short, these arguments amount to conclusory, unsupported denials of the government's asserted reasons for his non-selection, which are insufficient to create genuine issues of material of fact. See, e.g. Bonaccorsy v. District of Columbia, 685 F. Supp. 2d 18, 22 (D.D.C. 2010) ("Briefs containing mere allegations or merely denying the movant's pleading are not enough to prevent

---

[5] This sweeping argument is readily belied by the record, which shows that the relevant selections were *not* made by the same interview panel, as will be discussed thoroughly below. Nor does Jimenez identify any record evidence showing that he was the "highest graded applicant" for any of the positions.

summary judgment; instead, a non-movant must go beyond the pleadings to proffer specific facts rebutting the movant's assertions.").

As the Court noted in <u>Jimenez I MSJ</u>:

"[J]udges are not like pigs, hunting for truffles buried in briefs or in the record[.]"  <u>Jones v. Kirchner</u>, 835 F.3d 74, 83 (D.C. Cir. 2016).  "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."  <u>Consol. Edison Co. of N.Y., Inc. v. FERC</u>, 510 F.3d 333, 340 (D.C. Cir. 2007).  Said simply, "[j]udges are not expected to be mindreaders.  Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace."  <u>Schneider v. Kissinger</u>, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005).

Slip Op. at 17.  Here, Jimenez has neglected to spell out his arguments or support them with competent evidence.  The Court declines to do that work for him.  It therefore finds that none of the above contentions creates a genuine issue of material fact.  With that cleared away, the Court will now address the remaining issues relevant to each non-selection.

b.  <u>Event 3 & 4: Non-Selections for Supervisory Immigration Services Officer Positions in Miami, Hialeah, and Oakland Park, Florida</u>

In January 2013, Jimenez applied for multiple vacancies for a Supervisory Immigration Services Officer ("SISO") position in Miami, Hialeah, and Oakland Park, Florida.[6]  SOMF ¶ 42. Jimenez was offered an interview, along with 17 other candidates.  <u>Id.</u> ¶ 44.  The same panel, consisting of Elizabeth Clerie, Paul Buono, Enid Stulz, Anouchka Castro, and Eileen Lopez

---

[6]  Although the Agency's EEO Office separated out the vacancies for the three duty stations in Events 3 and 4, the Court will consider these events together because the positions stem from the same vacancy announcement (CIS-820062-D09) and involved the same panels and selecting officials.

Tome,[7] conducted the interviews for all three locations.  Id. ¶ 45; Def.'s Ex. 16, Jimenez Aff. at

189; Def.'s  Ex. 29, Clerie Aff at 234.  Interviewees were scored according to their responses to

interview questions and the quality of the writing samples that they prepared in the thirty minutes

prior to their interviews.  SOMF ¶¶ 46-47; Def.'s Ex. 29, Clerie Aff. at 234; Def.'s Ex. 30, Stulz

Aff. at 225.  Jimenez received the third-lowest score of all eighteen interviewees, in part because

he failed to specifically answer the interviewers' questions and his writing sample was poorly

organized. SOMF ¶ 47; Def.'s Ex. 32 (Scores of Applications); Def.'s Ex. 29, Clerie Aff. at 226,

236.  The three candidates with the highest scores were selected for the positions.  SOMF ¶ 46.

Those selectees were:

- Jonathon Disse (no record of prior EEO activity), who scored 75 points;

- Yasser Navarrete (no record of prior EEO activity), who scored 66 points;

- and Mark Crary (no record of prior EEO activity), who scored 52 points.

SOMF ¶ 49; Def.'s Ex. 31, EEO data of selectees; Def.'s Ex. 32, Scores of Applications 2013 at

444.  The selecting official, Steven Koch, concurred in the recommendations for selection.

SOMF ¶ 51.[8]  Jimenez claims that this non-selection was due to reprisal for his prior EEO

activity.

The government maintains that Jimenez was not offered the position for a legitimate,

non-retaliatory reason: his poor interview performance and writing sample.  SOMF ¶¶ 47-49.

_____

[7]  Given the sheer number of officials involved in the various non-selection claims, the
Court will dispense with its usual practice of including each official's title.

[8]  In Jimenez I, Jimenez also challenged his non-selection for SISO positions in Hialeah,
Miami, and Oakland Park, Florida.  However, the non-selections at issue in this case, though
they correspond to the same geographic locations, concern separate non-selections.  The same is
true for other non-selections discussed below.

Jimenez appears to argue that there is a bright-line rule prohibiting the government from relying on subjective considerations in selecting a candidate.  Opp. 35-36.  He is mistaken.  It is well established that "[s]electing a pool of qualified candidates based upon their written credentials and then making a final selection based upon personal interviews is an obviously reasonable method of hiring a professional employee."  Fischbach v. D.C. Dep. of Corr, 86 F.3d 1180, 1183 (D.C. Cir. 1996); see also Gordon v. Office of the Architect of the Capitol, 928 F. Supp. 2d 196, 209 (D.D.C. 2013) ("[T]he defendant is entitled to rely on a candidate's superior interview performance as a rationale for selecting one candidate over another."); Vaughan v. Amtrak, 892 F. Supp. 2d 84, 92–94 (D.D.C. 2012) (noting that anti-discrimination laws do not prohibit employer from considering "intangible qualities" such as interview performance in making hiring decision and collecting cases).   While subjective considerations may sometimes mask impermissible bias, Jimenez has failed to point to any evidence demonstrating that the agency's professed reason for his non-selection is not the actual one.  PSOMF ¶¶ 85-100.  Moreover, he makes no effort to compare his qualifications to those of the selectee.  As a result, he fails to show that the "'relative difference' between [his] qualifications" and those of the selectee "does not so greatly favor" the selectee "that no reasonable jury could conclude [that he] would have been [selected] but for the alleged retaliatory animus" of the deciding officials.  Savage, 2016 WL 4132196, at *6.  The government is therefore entitled to summary judgment on this claim.

        c.   Event 5: Non-Selection for Overseas Adjudications Officer Position in Athens, Greece

In December 2012, Jimenez applied for a GS-13 position as an Overseas Adjudications Officer in Athens, Greece.  SOMF ¶ 53.  Adonis Rubenstein reviewed the applicants' resumes and ranked them based on a scoring matrix that considered the considered the candidates' experience with: processing asylum, refugee, and adoption matters; serving as a supervisor;

living overseas; serving as a "liaison" (presumably to other agencies or USCIC components); and engaging in public outreach. SOMF ¶ 55; Def.'s Ex. 36, Rubinstein Aff. at 256-57. Additionally, the selection panel sought candidates with foreign language skills and advanced degrees. SOMF ¶ 55. Jimenez was not selected for an interview because based on those metrics, 75 other applicants received higher scores during the resume review stage. SOMF ¶ 55; Def.'s Ex. 36, Rubinstein Aff. at 256-57. Jimenez scored lower in part because he did not have an advanced academic degree or refugee processing experience. SOMF ¶ 56; Def.s' Ex. 36, Rubinstein Aff. at 257-58. As a result, he received zero points in those categories. SOMF ¶ 56. Ultimately, the selecting official, John Lafferty, chose Ty Wahaib-Twibell (no record of prior EEO activity) to fill the vacancy, based on his broad experience with immigration law, including with many of the types of cases handled by the Athens field office; his experience living abroad, including a prior detail to the Athens field office; and the fact that he possessed a law degree. SOMF ¶ 57; Def.'s Ex. 37, Ho Aff. at 262-63.

The government maintains that Jimenez was not selected because he lacked an advanced academic degree and experience processing immigration and asylum applications. Jimenez claims that explanation is pretextual, and, based on his statement of disputed facts, appears to assert that he did in fact have "experience in Refugee, Asylum, and International Operations." PSOMF ¶ 105. In support, he cites to his own resume, which states that he "participated in numerous meetings and teleconferences and discussed various immigration issues with other representatives . . . such as [those in] Refugee, Asylum and International Operations." Pl.'s Ex. 43, Jimenez Resume at 317. However, Jimenez fails to create a genuine issue of material fact because the government's proffered reason for not selecting Jimenez—his lack of experience *processing* immigration and asylum applications—is in no way undermined by the fact that

Jimenez's resume stated that he had attended meetings an teleconferences on general "immigration issues" with personnel from USCIS's Refugee, Asylum, and International Operations department.  Pl.'s Ex. 43, Jimenez Resume at 317.  Because Jimenez has failed to establish pretext, and makes no effort to show how his qualifications compare to those of the selectee, the government is entitled to summary judgment on this claim.

> d.  Event 6: Non-Selection for Overseas Adjudication Officer Position in Bangkok, Thailand

In December 2012, Jimenez applied for a GS-13 position as an Overseas Adjudication Officer in Bangkok, Thailand.  SOMF ¶ 59.  Sarah Shergill reviewed the applications of those individuals, including Jimenez, who appeared on a list of eligible candidates and determined who would be interviewed based on recent, in-depth refugee adjudications experience and recent supervisory experience.  SOMF ¶ 61; Def.'s Ex. 38, Shergill Aff. at 284-85.  Jimenez was not selected to interview, according to the government, primarily because he lacked recent refugee adjudications and supervisory experience.  SOMF ¶ 62; Def.'s Ex. 35, Jimenez's Resume at 458-73.  In contrast, the selectee, Kevin Riddle (no record of prior EEO complaints), had substantial recent refugee adjudications and supervisory experience.  SOMF ¶ 63; Def.'s Ex. 39, selection notice; Def.'s Ex. 40, Riddle resume.

Jimenez baldly asserts that the government's explanation for his non-selection is pretextual.  Yet he fails to address the actual explanation, identify genuine disputes of material fact, or demonstrate that "'relative difference' between [his] qualifications" and those of the selectee "does not so greatly favor" the selectee "that no reasonable jury could conclude [that he] would have been [selected] but for the alleged retaliatory animus" of the deciding officials. Savage, 2016 WL 4132196, at *6.  The government is therefore entitled to summary judgment on this claim as well.

e. Event 7: Non-Selection for Overseas Adjudication Officer Position in
Lima, Peru

In December 2012, Jimenez applied for a GS-13 Overseas Adjudication Officer position

in Lima, Peru.  SOMF ¶ 64.  Of the 104 eligible candidates, Erin Fatica, Michael Roma, and Eva

Rupp selected nine to interview based on their experience with Refugee, Asylum and

International Operations (a subdivision of USCIS), prior overseas living, refugee or asylum

training, adjudication of multiple USCIS immigration benefit application types, and supervisory

or management experience.  SOMF ¶¶ 65-66; Def.'s Ex. 41, Fatica Aff. at 268-69; Def.'s Ex. 42

Roma Aff. at 272.  Because Jimenez's resume did not demonstrate that he met these selecting

criteria, relative to the more than 100 other eligible candidates, he was not selected to interview.

SOMF ¶¶ 66-67; Def.'s Ex. 41, Fatica Aff. at 269; Def.'s Ex. 42, Roma Aff. at 274; Def Ex. 35,

Jimenez resume.  In contrast, the selectee, Michael Figueroa (no record of prior EEO activity),

met many of the desired criteria, including experience living overseas and adjudicating a variety

of the benefit applications that fall within the portfolio of the Lima Field Office.  SOMF ¶ 68.

Jimenez alleges that this non-selection was retaliation for his prior EEO activity.

According to Jimenez, the government's explanation is pretext for that retaliation because one of

the officials who conducted the resume review, Ms. Rupp, at one point in the EEOC proceeding

stated that she could not explain why Jimenez did not merit an interview or why he had received

a low resume score because she did not have the selection materials with her when she prepared

her affidavit.  PSMOF ¶¶ 134-35.  According to Jimenez, this lack of contemporaneous

documentation of the hiring process evinces pretext.  Opp. 33.  Although a lack of

contemporaneous documentation may be an indicator of pretext, on this record that lone

discrepancy is insufficient to create a genuine issue of material fact as to pretext, especially given

that Jimenez fails to establish that that "'relative difference' between [his] qualifications" and

those of the selectee "does not so greatly favor" the selectee "that no reasonable jury could conclude [that he] would have been [selected] but for the alleged retaliatory animus" of the deciding officials.  <u>Savage</u>, 2016 WL 4132196, at *6.  The government is therefore entitled to summary judgment.

> f.  <u>Event 8: Non-Selection for an Overseas Adjudication Officer Position in Manila, Philippines</u>

In December 2012, Jimenez applied for a GS-13 Overseas Adjudication Officer Position in Manila, Philippines.  David Roy selected candidates to interview based on the candidates' recent refugee experience, experience adjudicating immigration benefit applications, supervisory experience, and prior work overseas.  SOMF ¶ 70.  Jimenez applied for the position but was not selected to interview because his resume did not reflect that he had recent refugee experience, supervisory experience, or relevant overseas experience.  SOMF ¶¶ 71, 73-74; Def.'s Ex. 35, Jimenez's application.  Ultimately, Carl Risch (no record of prior EEO activity) was selected to fill the vacancy.  He possessed a law degree, had served as a Citizenship and Immigration Appeals Officer (GS-14) at the USCIS Administrative Appeals Office (AAO), had served multiple refugee processing details in Thailand, and had a history of volunteer service as a Refugee Resettlement Volunteer.  SOMF ¶ 72.

The government's explanation for passing Jimenez over—that he lacked the sought after qualifications—is legitimate and non-retaliatory.  Aside from his undifferentiated and unsupported attacks on the government's rationale, addressed above, Jimenez does not point to any facts to suggest that the government's explanation is not the true one.  And, indeed, Jimenez's resume reveals that he lacks many of the desired attributes for the position.  PSOMF ¶¶ 141-46.  The government is therefore entitled to summary judgment.

g.  Event 9: Non-Selection for Overseas Adjudication Officer Position in Moscow, Russia

Jimenez also applied for a GS-13 position in Moscow, Russia, in December 2012.  Def.'s Ex. 34, Vacancy Announcement.  Susan Aikman, Cheri Ho, and John Lafferty selected candidates to interview based on prior experience with: working on refugee-related issues, conducting refugee interviews, processing adoption cases, working overseas, and supervising employees.  SOMF ¶ 77.  The ability to conduct refugee interviews was a particular need due to the nature of work in Moscow.  Id.  Jimenez was not selected to interview because he lacked prior experience with refugees and asylum applicants.  Id. ¶ 78.  The selectee, Mary Alicia Roes (no prior EEO activity), had extensive refugee/asylum experience, including past work as a Refugee Officer in the Refugee Affairs Division of USCIS and significant other experience with refugee and asylum applications.  Id. ¶ 79.

Again, the government's explanation is legitimate and non-discriminatory.  Jimenez does not contest that the explanation is pretextual, conceding that he "was not the most qualified candidate" for the position; that "many of the other candidates had more relevant and extensive experience including recent experience handling immigration benefit petitions/applications;" and that "[a]ll candidates selected for interview also had experience in refugee/asylee processing." PSOMF ¶ 154.  Because Jimenez has not established pretext (and appears to concede that the government's reason was not pretextual), the government is entitled to summary judgment.

h.  Event 13: Non-Selection for Supervisory Immigration Officer Position in Washington, D.C.

In November 2013, Jimenez applied for a GS-15 SIO Branch Chief position in Washington, DC.  SOMF ¶¶ 81, 86; Def.'s Ex. 48, Vacancy Announcement.  The position required that the selectee have demonstrated leadership, supervision, and program management

34

skills.  SOMF ¶¶ 81-82.  Because none of the applicants had strong managerial experience,
USCIS closed the position without conducting any interviews.

The government offers a legitimate, non-retaliatory reason for closing the job vacancy:
none of the applicants, including Jimenez, met the qualifications desired.  Jimenez does not
respond to this argument or offer any evidence to show that this explanation was pretextual.  The
government is therefore entitled to summary judgment.  See e.g., Brookens v. Solis, 616 F. Supp.
2d 81, 93 n.13 (D.D.C. 2009) (granting summary judgment to the government after it presented
an unrebutted, legitimate, non-discriminatory reason for closing a vacancy).

i.   Event 14: Non-Selection for Supervisory Immigration Officer Position
in Washington, D.C.

In November 2013, Jimenez also applied for another GS-15 SIO position in Washington,
DC.  Def.'s Ex. 54, Vacancy Announcement.  Toni Swanson selected the candidates to interview
based on whether the applicant had GS-15 level experience in the following areas, as set forth in
the vacancy announcement: managing and supervising personnel in national security or fraud
programs; providing executive level briefings to senior officials; developing or implementing
national security and fraud programs and policies; reviewing complex adjudicative immigration
decision and legal issues for the position and other immigration related topics; and overseeing
the implementation of national security screening policies, as well as experience in program
management and oversight, law enforcement knowledge, and policy and program analysis.
SOMF ¶¶ 87-91.  Additionally, Swanson sought candidates with superior writing and analytical
skills.  Id.  Nine out of nineteen candidates were interviewed.  Id. ¶ 90.  Jimenez was not selected
to interview because he lacked the desired GS-15 experience.  In contrast, the three selectees,
Bryan Christian (national origin unknown; White; no record of prior EEO activity), Michael

Tennyson (national origin unknown; White; no record of prior EEO activity), and Kevin Quinn (national origin unknown; White; no record of prior EEO activity), had significant immigration-related program management experience and GS-15 leadership experience.  Id. ¶ 94-96.

The government's legitimate, non-retaliatory reason for not selecting Jimenez—that he lacked GS-15 management experience—is unrebutted by Jimenez.  PSOMF ¶¶ 168-70.  The government is therefore entitled to summary judgment on this count.

> j.   Event 15: Non-Selection for Supervisory Immigration Office in Washington, D.C.

In November 2013, USCIS announced a vacancy for a GS-15 Branch Chief position. The position's responsibilities included managerial duties at the intersection of the EB-5 visa program (business related immigration applications submitted to USCIS by entrepreneurs) and the national security and fraud issues handled by FDNS.  Def.'s Ex. 59, Vacancy Announcement at 762-63. The desired qualifications were leadership, experience supervising employees, experience with program management, law enforcement knowledge, and experience with policy and program analysis.  Id. at 763; SOMF ¶¶ 98-100.  Jimenez was not selected to interview for this position because he lacked any experience as a permanent GS-15 supervisor, nor did he have any experience with the EB-5 program or other business-related immigration programs.  Def.'s Ex. 71, Jimenez Depo. Tr. at 90-91.  Selecting official Matthew Emrich selected Matthew O'Brien (national origin unknown; White; no record of prior EEO activity) for the vacancy because, unlike Jimenez, O'Brien had the desired qualifications, including previous service as a GS-15 supervisor and substantial experience with policy and program management.  SOMF ¶ 104.

Once again, Jimenez fails to respond to the government's asserted legitimate, non-

retaliatory explanation that Jimenez was not selected due to his lack of GS-15 management

experience.  PSOMF ¶¶ 171-72.  The government therefore is entitled to summary judgment.

> k.   Event 16: Non-Selection for Immigration Officer in Miami, Florida

Lastly, in November 2013, Jimenez applied for a vacant GS-13 Immigration Officer

position in Miami, Florida.  Jimenez was offered an interview for the position, but when his

interview commenced, Jimenez objected to the inclusion of one of the interview panel members,

Kevin Quinn.  SOMF ¶ 108-09.  Jimenez asked to have Mr. Quinn removed from the panel, but

the agency declined, explaining that Mr. Quinn had already participated in other candidates'

interviews.  Id.  At that point, Jimenez refused to complete the interview and instead withdrew

his application.  SOMF ¶ 108-09; Am. Compl. ¶ 62.  According to Jimenez, he chose not to

participate because he had previously filed an EEO complaint against Quinn and felt that Quinn

could not be fair in evaluating his application.  PSOMF ¶ 175-76.  After he declined the

interview, Jimenez never requested reinstatement for consideration for the position.  PSOMF

¶ 181.

The government contends that it is entitled to summary judgment because Jimenez

removed himself from consideration for the vacancy.  See, e.g., Silver v. Leavitt, Civil Action

No. 05-0968 (JDB), 2006 WL 626928, at *10 (D.D.C. Mar. 13, 2006) ("It was plaintiff, not

defendant, who skewed the selection process in 2004—by declining an interview, plaintiff placed

herself at a disadvantage.").  Relying on Gilliard v. Gruenberg, 302 F. Supp. 3d 257 (D.D.C.

2018), Jimenez retorts that other courts in this district have recognized non-selection claims in

similar situations.  While the Court rejects the government's per se rule, it finds that Gilliard is

readily distinguishable.  There, the plaintiff alleged that one of the interview panel members had

disparaged her to the other panel members and therefore withdrew her application for a vacancy.

Id. at 283.  In contrast, here Jimenez has made no such allegations, much less presented proof to

that effect.  Accordingly, on this record, the Court grants summary judgment to the government.

    C.   Failure to state a claim for Retaliatory Hostile Work Environment

Lastly, the government urges the Court to dismiss Jimenez's retaliatory work

environment claim for failure to state a claim.

"To prevail on a hostile environment claim based on previous participation in protected

activity, a plaintiff must show that he 'was subjected to retaliatory intimidation that was

'sufficiently severe or pervasive to alter the conditions of [his] employment and create an

abusive working environment.'" Jimenez I MJP, 395 F. Supp. 3d at 36 (quoting Román v.

Castro, 149 F. Supp. 3d 157, 166 (D.D.C. 2016).  In assessing severity and pervasiveness, courts

look to "'all the circumstances,' including 'the frequency of the [retaliatory] conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance.'" Baird v. Gotbaum,

792 F.3d 166, 169 (D.C. Cir. 2015) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23

(1993)).  The conduct is considered on a sliding scale: "The more severe the harassment, the less

pervasive it needs to be, and vice versa." Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 579 (D.C.

Cir. 2013) (internal quotation marks, citation omitted).  To be cognizable under Title VII,

"conduct must be extreme" to "ensure that Title VII does not become a general civility code"

requiring courts to police "the ordinary tribulations of the workplace." Faragher v. City of Boca

Raton, 524 U.S. 775, 788 (1998) (internal quotation marks, citations omitted).

To recap, the remaining, properly exhausted acts include only Event 10, which alleges

that: (a) Jimenez was not provided a mid-cycle review for his FY13 PPA; (b) management

violated agency policy by requesting that he leave the worksite immediately after his shift ended; (c) management failed to respond to Jimenez's requests for the relevant policy; and (d) management once chastised Jimenez for contacting upper management.  Am. Compl. ¶¶ 39-45.

The government contends that these identified claims are insufficiently severe or pervasive.  Jimenez fails to respond to these arguments in any way.  Opp. 28-38.  Although the Court could treat the government's argument as conceded, Jimenez's claim fails on the merits in any case because the actions complained of in Event 10 are simply "ordinary 'work-related actions by supervisors,' which 'courts typically do not find . . . to be sufficient for a hostile work environment claim.'"  Jimenez I MJP, 395 F. Supp. 3d at 36 (quoting Munro v. LaHood, 839 F. Supp. 2d 354, 366 (D.D.C. 2012)).  The Court therefore will grant the government summary judgment on this claim.

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss or in the Alternative for Summary Judgment in full.  A separate Order shall accompany this memorandum opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  September 29, 2020